IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THE GOOGLE ACCOUNT **herb29401@gmail.com** THAT IS STORED AT PREMISES CONTROLLED BY GOOGLE, INC. | Magistrate No. _19-33_ <br> **UNDER SEAL** |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Chase A. Stephens, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for information associated with certain a Google account that is stored at premises controlled by Google, Inc. ("Google"), a company headquartered at 1600 Amphitheater Parkway, Mountain View, CA 94043.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Google to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

2.      I am a Special Agent with the Federal Bureau of Investigation, and have been since June 2015.  Prior to becoming an FBI Special Agent, Affiant was employed with the FBI as an evidence technician since February 2010.  I am currently assigned to the Pittsburgh Field Office and I am investigating the matters described below along with members of the Pennsylvania State

Police Western Regional Auto Theft Task Force ("WRATTF"). As a Special Agent of the FBI, your Affiant received basic training at the FBI Academy located in Quantico, Virginia. Upon graduation, your Affiant was assigned to work white collar crime matters in the Pittsburgh Division. In this capacity, your Affiant was responsible for investigating possible violations of federal criminal laws, including Wire Fraud, Mail Fraud, and Money Laundering. Your Affiant is currently assigned to a Transnational Organized Crime Squad and is responsible for investigating possible violations of criminal laws, including Drug Trafficking and Interstate Transportation of Stolen Property. Through the course of my training and experience, your Affiant has become familiar with the methods and techniques associated with the investigations described above. Through the course of my training and experience, your Affiant has realized that email accounts are regularly used during the course of criminal activity by individuals in order to communicate, coordinate, or sometimes execute their criminal conduct. My training and experience as an FBI Special Agent has made me familiar with the types of data that can be obtained from email accounts, to include data stored within the account as well as data available from services linked to the account. Your Affiant has regularly used data retrieved from email accounts to further his criminal investigations.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. Sections 371 (conspiracy) and 2312 (interstate transportation of stolen motor vehicles) have been committed, are being committed, and

2

will be committed by Herbert Lee White, Jr. (hereinafter "WHITE") and other persons not yet identified. There is also probable cause to search the information described in Attachment A as to each email account for evidence of these crimes as further described in Attachment B.

## JURISDICTION

5.      This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) and (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

6.      The FBI is working with WRATTF in the investigation and prosecution of crimes associated with organized theft of vehicles, heavy equipment, landscaping equipment and all-terrain vehicles. The investigation concerns violations of 18 U.S.C. Sections 371 and 2312.

7.      The FBI and WRATTF are investigating two related thefts that occurred on 08/29/18 along Kuhl Road, Harborcreek Township, Erie County, PA. The thefts occurred at the A.R. Beatty Kubota dealership located at 5251 Kuhl Road, Erie, PA 16510, and at Fabin's Trailers and Truck Equipment located at 5324 Kuhl Road, Erie, PA 16510. The theft from A.R. Beatty involved four pieces of Kubota equipment, namely a 60" Kubota zero-turn mower, model ZD1211-60, serial #22529, a Kubota backhoe loader, model BX23SLB-R, serial #21275, a Kubota RTV utility vehicle, model RTV-X1120WL-A, serial #30094, and a Kubota RTV utility vehicle, model RTV-X1100CLR-A, serial #43650. These stolen items have a combined value of approximately $60,000.00. Additionally, the theft from Fabin's Trailers and Truck Equipment resulted in the loss of a 24-foot 2019 Continental Cargo enclosed trailer, VIN: 5NHUVHZ28KN088112, valued at $6,345.00.

3

8.      On 08/30/18, WRATTF members went to A.R. Beatty, Fabin's Trailer and Truck Equipment, and Meadowlark Structures located at 5250 Kuhl Road, Erie, PA 16510 to review surveillance video of the incident.  Meadowlark Structures sits between the two victim locations on the north side of Kuhl Road.

9.      By reviewing surveillance video on scene and through continued investigation, investigators determined that the perpetrators arrived at the scene on 08/29/18 at approximately 0220 hours.  At that time, a white pick-up truck arrived on scene followed by a dark pick-up truck towing a white enclosed trailer.  The vehicles arrived from Kuhl Road, traveling west to east.  The first pick-up truck can be described as a white in color, Ford F-250 SuperDuty extended cab pick-up truck with cab lights.  The second pick-up truck can be described as a dark in color, Ford F-350 Crew Cab pick-up with dual rear axle wheels, marker lights on the rear fender flares, and cab lights.  This truck was hauling a white in color, 28-foot ATC enclosed trailer with a flat nose, dual axle, and anodized aluminum front corners.  Investigators also noted a discoloration to the passenger side man door of the trailer and aftermarket wheels.

10.      The white Ford F-250 traveled past Fabin's Trailers and Truck Equipment, turned around on Kuhl Road, then parked at The Power of Precision business located at 5325 Kuhl Road, Erie, PA out of camera view.  The dark Ford F-350 with the trailer turned onto the property of Meadowlark Structures and parked.  The driver of this vehicle then placed an object covering the registration plate of the vehicle.  The registration plate for this vehicle could not be determined prior to concealment.  Two actors can then be seen on the lot of A.R. Beatty, stealing the equipment and driving the machines to a staging area near a Harborcreek Township pump station alongside Kuhl Road. An actor wearing dark clothing and a hood to hide his/her appearance then appeared in the driveway of Fabin's Trailers and Truck Equipment carrying a 2x4 piece of wood.  The actor

4

then approached a camera and knocked the camera out of position using the 2x4. This actor can then be observed on a different camera directing the white Ford F-250 as it backed up and attached the stolen Continental Cargo trailer before leaving the lot. The two actors can then be seen riding the stolen Kubota machines along Kuhl Road and in the direction of the vehicles and trailers. Both trucks and trailers are then seen leaving the scene together at 0431hrs and entering onto I-90, heading eastbound from exit 32.

11.     Investigators were able to track the actors' approach to the victim dealerships prior to the thefts by reviewing surveillance videos from numerous businesses and private property owners along a 92.5 mile route. Investigators observed videos that showed what appears to be the above described vehicles in the exact configuration of a white, Ford F-250 SuperDuty pick-up followed by a dark Ford F-350 pick-up towing a white enclosed trailer. By examining the videos, the investigators were able to identify a 92.5 mile segment of the actors' trip as they traveled toward the victim businesses prior to the thefts. That segment is from Brookville, Jefferson County to the victim businesses on Kuhl Road. The investigators were not able to find videos showing the subject vehicles anywhere prior to their appearance in videos in Brookville. Thus, the home location of the vehicles could not be determined from the videos alone. Their exact route of travel from Brookville to Kuhl Road, including mileage and corresponding time through their arrival at the victim locations on Kuhl Road, approximately 92.5 miles, was determined.

12.     The video surveillance evidence described above indicates that the actors traveled a significant distance and specifically targeted the two victim businesses. The actors driving the two trucks obviously coordinated their efforts and worked in tandem to carry out the plan to steal the items described above and then make their getaway together.

5

13.     Investigators requested and received license plate reading (LPR) camera data from the New York State Intelligence Center (NYSIC) for LPR cameras along Interstate 86 through New York that was possibly the route that the suspects fled after committing the thefts in Erie. Data, including photos of all captured license plates, was received from a fixed site LPR camera. The available data was reviewed based upon the time and distance from the victim dealerships in Erie, PA to known fixed LPR camera position. Investigators discovered a South Carolina trailer registration that initially appeared as BV66824, but after closer inspection, investigators found that the "B" had been noticeably altered and was in fact a "P." Further, the "8" was actually a "0" that had been altered by adding a horizontal line through the center.  The South Carolina registration plate observed was PV66024, which belongs to WHITE.

14.     In the experiences of investigators for WRATTF, in organized thefts with multiple actors, such as the thefts in the instant matter, the thieves typically communicate before, during and after the thefts, frequently by the use of cell phones.

15.     On 10/09/18, investigators received a response from a Court Order submitted to Verizon Wireless on 10/05/18 pertaining to tower dumps at locations along the actors' known route of travel to A.R. Beatty's/Fabin's Trailer and Truck Accessories on 08/28/18 into 08/29/18.

16.     The results from Verizon were received through a secure, password protected email and contained several file attachments.  The information provided by Verizon included call details records for each cell tower covering the requested sites.  Investigators noted one (1) cell phone number that had activity (calls) inbound and outbound that was captured by Verizon cell towers in four (4) of the known locations within the corresponding timeframe of travel, including the theft location.  A cellular telephone number 843-708-2204, a Verizon network number, was captured with calls to and from cellular telephone 908-759-8889, which is serviced by Sprint.  A total of

6

seven (7) calls were made between these two (2) numbers between 2354 hours on 08/28/18 and 0218 hours on 08/29/18.  None of these calls lasted longer than (4) minutes.  Additionally, the records show that there were no other calls made to or from 843-708-2204 other than those calls made with 908-759-8889.

17.    Also of significance is the final call, which was an outbound call from 843-708-2204 to 908-759-8889 that occurred at 0218 hours on 08/29/18 with a 61 second duration.  This call was placed three (3) minutes prior to the suspect vehicles arriving at the theft location.

18.    Area code "843" serves the eastern third of South Carolina including the city of Charleston. Open source records indicate that cell phone number 843-708-2204 has no known registered owner.

19.    Area code "908" serves the North and Central parts of New Jersey.  Open source records indicate the cell phone number 908-759-8889 is registered to a Nataly Caban of 702 Summer Avenue, Newark, NJ 07104.

20.    During the course of this investigation and through shared intelligence information between other law enforcement entities, including the Pennsylvania State Police Central and Eastern Regional Auto Theft Task Force Units, investigators learned of WHITE, DOB: 03/01/71, of 49 Pergola Avenue, Jamesburg, NJ 08831.  WHITE has been arrested for similar such thefts dating back to 2006 and is a suspect in several more recent thefts across Pennsylvania, New Jersey, and Maryland.  WHITE's legal residence for his driver's license and registered vehicles is 7815 Magellan Drive, North Charleston, SC 29420.  A query through the SCDOT shows that WHITE has a black, 1999 Ford F-350 dually pick-up truck, SC registration 3897LP (previous SC registration of 2890HP, expired 10/31/17) registered to him along with several trailers. One being a 2009 trailer (generic) bearing SC registration PV66024.

7

21.     As it pertains to this investigation, investigators believe that the 28-foot ATC enclosed trailer that the suspects used to facilitate the theft at A.R. Beatty's was stolen on 01/20/16 at approximately 2305 hours from a known location in Pennsylvania.  South Whitehall Police, Lehigh County, report that surveillance video shows a white, Ford 250 pick-up truck with five (5) cab lights being used to steal the trailer.  The white, Ford F-250 pick-up and stolen ATC trailer were then captured on video following a black, Ford F-350 pick-up truck to Best Line Equipment Leasing, also in South Whitehall Township.  Five (5) pieces of Kubota equipment where then stolen from Best Line Equipment Leasing between the hours of 0122 hours and 0330 hours on 01/21/18.  The white, F-250 pick-up truck and stolen trailer were captured by surveillance video on the lot at this time.

22.     Additionally, two botched Kubota theft attempts resulted in WHITE and/or his black, Ford F-350 pick-up truck being identified by law enforcement and private citizens. Summaries regarding these two botched attempts are provided below:

     a.  On 09/01/16 at 0135hrs, an attempted theft occurred at Antietam Tractor and Equipment in Hagerstown, Maryland where owner was alerted by GPS that pieces of his equipment were moving.  The police were notified and responded to the scene to find a black, F-350 pick-up truck bearing SC registration 2890HP and a white, enclosed trailer bearing SC registration PV66024 parked nearby.  Two pieces of Kubota equipment were found staged at the edge of the business property.  An individual identified as WHITE approached the officers on scene about his truck and trailer.  WHITE stated that he had been with a "backpage" girl all night was just returning to retrieve his vehicle. The officers allowed WHITE to drive away with his truck and trailer because the blue shorts and white t-shirt that he was wearing did not match the clothing of the suspect observed removing the machines in surveillance video.

     b.  On 04/01/17 at 0010hrs, an attempted theft occurred at Pipersville Garden Center in Pipersville, Bucks County, PA.  After the employees arrived later that morning, they observed ruts in the lawn adjoining the business, which caused them to review surveillance video from the night prior.  The surveillance video showed black, F-350 pick-up truck and large, white enclosed trailer in the business's lawn.  An actor,

8

whose appearance is consistent with that of WHITE, is observed moving two (2) Kubota RTVs towards the front of the lot near the business entrance, but when the actor attempts to move his truck and trailer into position to pick-up the machines, he becomes stuck in the mud. Dunne's Towing was contacted and was retained to extract the truck and trailer from the mud. A subsequent interview of Dunne Hagan, owner of Dunne's Towing, who's company extracted the vehicles from the mud, was conducted by Sergeant Brian Pfaff. Mr. Hagen advised that one his drivers, Hendricks Badenhorst, responded to the call to extract the vehicles. Mr. Badenhorst did not request any identification from the driver of the vehicles because he described the incident as a "simple winch out.". Mr. Hagan further stated that the phone number that was used to call Dunne's towing for the extraction was telephone number **843-603-0612**. The driver for Dunne's Towing was suspicious of the circumstances and surreptitiously photographed the truck and trailer registration, which was SC registration 2890HP (truck) and SC registration PV66024 (trailer). Both of these registration plates belong to WHITE.

23.     As demonstrated above, WHITE has shown a propensity for criminal activity and is not only a suspect in the thefts at A.R. Beatty and Fabin's Trailers and Truck Accessories, but has been active in stealing Kubota equipment and trailers since his release from prison in New Jersey on 09/16/15. Specifically, in addition to the incidents mentioned above, WHITE is suspected in numerous other thefts based on *modus operandi*, a vehicle consistent with WHITE's truck being observed during the theft, and/or statements made by those who have had stolen Kubota equipment seized from them.

24.     Based upon the aforementioned probable cause, investigators applied for and received pen register, ping data, and historical call detail records (CDRs) including cell site locations for **Target Telephones 843-708-2204** and **908-759-8889**. The pen register and ping/CDR orders were signed into effect by Federal Magistrate Judges in the Western District of Pennsylvania on November 16, 2018 and December 6, 2018, respectively. Pen register logs show continued but sporadic communications between the **Target Telephones.**

9

25.     On December 10, 2018, investigators with the WRATTF learned of Pennsylvania State Police Incident PA18-1452377, which was reported to police on December 8, 2018 by M&R Equipment, 620 Evans City Road, Butler, PA 16001.  During this incident, a 2018 Kubota L3901HST Compact Tractor, Serial #78107 with front loader bucket and backhoe and a 2018 Kubota BX23SLB-R Compact Tractor, Serial #24496 with front loader bucket were stolen.  The combined value of these two pieces is approximately $46,500.00.

26.     Investigators responded to the scene and reviewed surveillance video from the victim business as well as surrounding businesses.  Through surveillance video at M&R Equipment, it was determined that on December 6, 2018 at 00028hrs. a black, Ford F-350 dually pick-up truck towing a large, white enclosed trailer arrives from the Northeast along Evans City Road and parks in the lot at Farm Credit Services located at 610 Evans City Road, Butler, PA 16001, which is adjacent to M&R Equipment. A single occupant then exits the truck and approaches M&R Equipment.  The actor is wearing dark clothing and no distinguishable characteristics of the actor can be observed.  The actor proceeds to start the two stolen tractors and drive them off the lot at M&R Equipment and into the white, enclosed trailer. At approximately 0104hrs, the actor exits the lot at Farm Credit Services in the truck and trailer containing the stolen tractors and turns right to continue along Evans City Road in the southwest direction.  The actor then passes directly in front of M&R Equipment, and investigators were able to observe unique and individualizing defects to the man door on the "passenger side" or right side of the trailer. These unique defects are consistent with the defects observed on the ATC trailer used in the earlier theft at A.R. Beatty Diesel, Inc. on August 29, 2018.  This black Ford F-350 pick-up and white enclosed ATC trailer are undoubtedly the same truck and trailer configuration used in previous incidents in this investigation.

27.     Based on the known direction of travel of the actor to and from M&R Equipment and using the historical Call Detail Records (CDR) for **Target Telephone 843-708-2204** that were received from Verizon on December 17, 2018, investigators were able to trace the suspected route from New Jersey beginning on December 5, 2018 and continuing to M&R Equipment before returning to New Jersey on December 6, 2018.   The CDRs and cell site information does not pinpoint a certain location but does provide the cell tower and physical location for that cell tower in which a cell phone is provided coverage.  Investigators were able to confirm the suspected route by obtaining surveillance video of the roadway from various businesses.   Investigators first observed the black, Ford F-350 dually pick-up and white enclosed trailer traveling Northbound past a Sheetz gas station located at 4354 Business 220, Bedford, PA 15522 on December 5, 2018 at approximately 2050hrs.   The same truck/trailer configuration are next observed passing the Lake Inn Motel and Restaurant located at 1001 Rowena Drive (State Route 422), Ebensburg, PA 15931 travelling east to west on December 5, 2018 at approximately 2233hrs. The same truck/trailer configuration are next observed at a Sheetz gas station located at 13510 State Route 422, Kittanning, PA 16201 on December 5, 2018 at approximately 2338hrs.  On this occasion, the truck/trailer configuration arrives at Sheetz traveling east to west and pulls into the gas station for fuel.  The actor exits the vehicle enters the store to prepay $60.00 in cash for fuel.  The actor is observed to be a black male approximately 40 years old, wearing navy blue coveralls with a white undershirt and a dark knit winter hat.  After fueling up the truck, the actor exits Sheetz and continues westbound on State Route 422 towards Butler, PA.  The same truck/trailer configuration is next observed passing another Sheetz gas station found at 499 Evans City Road, Butler, PA 16001 on December 6, 2018 at approximately 0018hrs and continuing towards M&R Equipment located approximately 0.5 miles away.  The CDR cell site locations captured on **Target Telephone**

11

**843-708-2204** showed cellular activity captured in the areas of Bedford, PA and Altoona, PA, which are consistent with the times and locations along the actor's known route to M&R Equipment.

28.     Through the course of this investigation, Detective William MINETT of the WRATTF has had the opportunity to view the driver's license photo on Herbert WHITE's South Carolina driver's license.  WHITE's driver's license photo is consistent with the actor captured on surveillance video at Sheetz gas station in Kittanning, PA on December 5, 2018.  Detective MINETT believes that Herbert WHITE was operating the Ford F-350 pick-up and trailer at M&R Equipment and is responsible for the theft.

29.     On December 19, 2018, investigators learned of two separate thefts in Western Pennsylvania, both occurring in the late evening hours of December 18, 2018 and early morning hours of December 19, 2018.  Viking Spirit Trailers located at 839 Evans City Road, Evans City, PA 16053 reported a theft of a 2019 Cargo Express Enclosed Trailer, VIN: 53BCTEB20KA046569, value approximately $6,500.00, to the Pennsylvania State Police, incident PA18-1499444.  The stolen trailer is 24 feet in length, white in color, V-nosed, with a man door on the "passenger side" or right side. On the same morning, Carn's Equipment located at 14357 Clearfield Shawville Highway, Clearfield, PA 16830 reported the theft of two utility task vehicles (UTVs) to the Lawrence Township Police.  The two stolen UTVs are described as a 2019 Polaris Razor 1000XP, VIN: 3NSVDK997KF585346 and a 2018 Polaris Razor 1000XP, VIN: 3NSVDR990JF404353, with a total combined value of $50,000.00.

30.     Investigators reviewed ping and CDR location records for **Target Telephone 843-708-2204** on December 18, 2018 through December 19, 2018 and found that the this telephone showed ping activity from New Jersey westbound along the Pennsylvania Turnpike to the vicinity

12

of Wexford, PA; activity near Bradford, PA then southbound to Interstate 80, and finally, eastbound along Interstate 80 through Clearfield County back to New Jersey. The activity is consistent with the timeline of the thefts on December 18, 2018 and December 19, 2018 from Viking Spirit Trailers and Carn's Equipment.

31.     Investigators reviewed video surveillance from local businesses along Evans City Road/State Route 68 in the area of Viking Spirit Trailers and found video of a black, F-350 pick-up with dually wheels, cab lights, and a burned out marker light on the driver's side rear fender travelling east along Evans City Road and turning left into the Brandywine Housing Development at approximately 2100hrs on December 18, 2018. The truck is next observed coming back out of the Brandywine Housing Development and turning right onto Evans City Road towards Viking Spirit Trailers. Viking Spirit Trailers is located approximately 0.1 miles from the entrance of the Brandywine Housing Development. Approximately 20 minutes later, the same black, F-350 pick-up with dually wheels, cab lights, and a burned out marker light on the driver's side rear fender is observed travelling east along Evans City Road towing a large, white, V-nosed trailer consistent with the trailer stolen from Viking Spirit Trailers. Viking Spirit Trailers does not have surveillance cameras on site.

32.     Investigators with the WRATTF also responded to Carn's Equipment, which is a recreational motor vehicle dealership located approximately 0.3 miles from the Exit Ramp 120 – Clearfield of Interstate 80. Surveillance video from the dealership showed that at approximately 0306hrs on December 19, 2018, a black, F-350 dually pick-up truck with cab lights towing a large, white, V-nosed enclosed trailer arrive on site and park in an adjacent lot. A single actor, a black male wearing dark coveralls and a dark knit winter hat, is then seen moving about the dealership lot in the area of several Polaris Razors. Surveillance video and evidence found on scene indicates

13

that the actor uninstalled and then reinstalled a different ignition system on two UTVs. The actor then returns to the truck/trailer and pulls the vehicle alongside the dealership before loading the two aforementioned Polaris Razors into the enclosed trailer and departing at approximately 0405hrs.

33.     While reviewing the cell site information contained in the CDRs and ping information for **Target Telephone 843-708-2204**, which corresponds with the known, observed locations of the black F-350 dually pick-up and trailers along the travel routes to and from the thefts at M&R Equipment, Viking Spirit Trailers, and Carn's Equipment, investigators observed several calls and more importantly, text messages to common numbers in the hours prior to and after these thefts. More specifically, these text messages were exchanged while the actor was travelling to or from the victim dealerships with stolen machines. The content of these text messages most likely contain evidence implicating the actor and information as to where the stolen machines were delivered.

34.     On 12/19/18, investigators received a response from a grand jury subpoena submitted to Facebook on 12/6/18 pertaining to the Facebook account of WHITE. Investigators reviewed the records and determined that WHITE registered his account with email address **herb29401@gmail.com** (Hereinafter referred to as "**Target Account**").

35.     Due to the large geographical region between where White resides and where the victims are located, investigators believe it is likely that WHITE located his targets online and conducted research, likely via Google, on the victim dealerships prior to the thefts. It is not likely that WHITE blindly drove to the victim locations in hopes that he would find an item which he could steal.

36.     Due to WHITE's likely lack of geographical knowledge of the victim locations, investigators also believe that WHITE may have used Google Maps or some other form of online navigation to aid in his travel to the victim locations.

37.     Investigators also believe WHITE and/or his co-conspirators may communicate using the **Target Account** in order to plan, coordinate, or discuss criminal activity, to include the sale or disposition of stolen items.  The **Target Account** may also be linked to websites such as Craigslist or Facebook Marketplace which can be used to facilitate the sale of the stolen items.

38.     Based upon my knowledge, training, and experience, Affiant knows that individuals regularly login to their email accounts from their electronic devices, specifically cellular telephones.  Based upon investigators review of ping and historical call detail records related to WHITE's telephone, **Target Telephone 843-708-2204**, investigators are aware that WHITE is in possession of his cellular telephone when committing the violations under investigation.  Therefore, affiant believes that the **Target Account**, belonging to WHITE, likely contains records and data which will constitute fruits, contraband, evidence, and instrumentalities of violations of 18 U.S.C. §§ 371 and 2312.

## BACKGROUND CONCERNING GOOGLE

39.     In my training and experience, and based on my review of Google's website, terms of service, and privacy policy, I have learned the following about Google:

40.     Google is a U.S. company that provides a variety of online services to the public. As described in further detail below, these services include, among many others, email, instant messaging, web searching, and file storage.

41.     Google allows subscribers to obtain access to its services by registering for a "Google Account."  A Google Account consists of a single username and password, and is

15

uniquely associated with a Google email address, typically at the domain name "gmail.com," like the Google Account listed in Attachment A. Once a subscriber obtains a Google Account, the subscriber can use that same username and password to sign into any Google product. In other words, a Google Account username functions as a subscriber's username across all of the dozens of Google services offered to the public. Google treats each account holder as a single user across all Google products. Google combines information that a user has provided from one service when signed in with information from other services.

42.     Google asks subscribers to provide certain personal identifying information when registering for a Google Account. Such information includes the subscriber's first and last name, date of birth, telephone number, other email address, and country of residence. Based on my training and experience, I know that such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. Based on my training and experience, I know that even if subscribers insert false information to conceal their identities, this information often provides clues to their identity, location, or illicit activities.

43.     One of Google's most popular services is Gmail, Google's email service. Google allows subscribers to obtain email accounts at the domain name gmail.com. In general, an email (which can include attachments such as documents, images, and videos) that is sent to or from a Google subscriber, or stored in draft form in the account, is automatically stored in the subscriber's Gmail account on Google servers until the subscriber deletes the email. If the subscriber does not delete a message from Gmail, the message can remain on Google servers indefinitely. Even if the subscriber deletes the email, it may continue to be available on Google's servers for a certain period of time. A Gmail user can also store files in addition to emails, such as address books, contact lists, user groups, pictures (other than ones attached to emails), and other files, on servers

16

maintained and/or owned by Google.  In my training and experience, evidence of who was using an email account may be found in address books, contact lists, email in the account, and attachments to emails, pictures, and other files.

44.     Google Calendar allows users to create and store events.  The Calendar entries may include the date, time, and location of particular events.  Users can share individual events or entire calendars with other users.  In my experience, Calendar information can reveal evidence regarding the user's identity and/or whereabouts, as well as an indication of other co-conspirators.

45.     Google Maps provides users with a variety of records and tools related to maps and location.  The information stored by Google associated with an account holder's use of Google Maps may include all maps for which the user previously searched, records associated with custom maps created by or shared with the user, changes and edits to public places made by the user, starred places, private labels, and saved locations.  Based on my training and experience, Google Maps can contain evidence of the user's location and identity.  For example, a user will frequently save his home and/or work locations, and will "star" or favorite common destinations.  A user who plans a robbery may search for the victim's location via Google Maps and may use Google Maps to get directions from the user's residence to the victim location, revealing both the user's address and specific planning steps taken in furtherance of the crime.

46.     Google Drive allows users to create, store, edit, and share documents and other files.  Google Drive encompasses various Office Suite applications, such as Docs (documents), Sheets (spreadsheets), and Slides (slide-based presentations).  Files and documents stored in Google Drive are accessible from any smartphone, tablet, or computer, and can be shared with other users to view, edit or download.  Google Drive files on a user's device will automatically "sync" with a user's Google Drive files on the web, so that a user can access and launch the same

17

files from all of the user's devices.  In general, a file on Google Drive is stored on Google servers until the subscriber deletes the file.  Even if the subscriber deletes the file, it may continue to be available on Google's servers for a certain period of time.  In my training and experience, evidence of who was using a Google account, and evidence related to criminal activity of the kind described above, may be found in these files and records.  For example, a user can use Google Drive to maintain a spreadsheet of incoming wire transfers and the related payments owed to co-conspirators.

47.     A user's Google Drive may also contain back-up information from third-party apps. In some cases, such as with the messaging application WhatsApp, the back-up data is contained in a "hidden folder" which is inaccessible to the user.  While Google may be able to produce the data, investigators may need to seek assistance from the third party behind the application in order to read or otherwise use the information.

48.     Google offers a service through which a computer user can search webpages for text that the user enters.  Under some circumstances, Google saves the user's text searches for later retrieval.  Google also maintains Web History records for its users, recording information about the user's online activity.  Web History records may include, among other things, the Google searches the user conducts, the web sites the user visits, and the videos the user watches.  Google's Web and App Activity records for a user may similarly save the user's search activity on applications and browsers, including information about the websites the user visits; the applications that he uses; advertisements that the user clicks; and the user's location, language, and Internet Protocol address ("IP address").  This activity information can be saved even when the user is offline.  Based on my training and experience, I am aware that a user's web and search history may include evidence of the crime itself as well as the user's identity and state of mind.

49.     Google allows users to connect their Google Accounts to Chrome, Google's web browser.  When a Google Account is signed into Chrome, all of the user's Chrome data, such as bookmarks, history, passwords, and other settings, are synched to the user's Google Account. The data is stored on Google's servers and made available to the user wherever he signs into Chrome, regardless of the device or location.  Google may also keep records of the webpages or IP addresses that a user clicks on or types directly into his web browser's address bar if the user has logged into Google Chrome.  For users of Google Chrome, Google may also save information that the user provided to third-party websites via forms filled out while logged into Chrome.  This "Autofill" information may include the user's name, address, phone number, email address, and payment information.  Based on my training and experience, information associated with Google Chrome may constitute evidence of the crime, as well as indicate the user's identity and location.

50.     Google allows users to set up Google Alerts, which notify the user via email whenever user-selected search terms appear in the news or in Google Search results.  Based on my training and experience, Google Alerts information can constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.  For example, an individual operating under an alias may set a Google Alert for references to his real name, revealing his true identity.

51.     Google offers multiple services enabling users to send messages and communicate with one another in real time.  Google Hangouts, Google's primary web-based instant messaging service, allows users to send text-based messages, make voice or video calls, and share photos, and can be accessed from within a Gmail browser window.  Instant messages sent and received using these services are often saved within a user's account.  In my training and experience, messages sent through Google's messaging services may reveal evidence related to criminal

19

activity of the kind described above. Information pertaining to other participants in the conversation can also identify co-conspirators or additional individuals otherwise involved in the criminal activity.

52.     Google Messenger is a messaging service available to mobile phone users. Messenger allows users to send text, photo, video, and voice messages from the Messenger application. Google also offers Allo and Duo, messaging applications similarly available to mobile phone users. The Allo and Duo applications are available to users even outside of their Google Accounts. Google Allo allows users to send text, photos, and other graphic items. Google Allo users can use Allo to communicate with non-Allo users by text message. Google Duo allows users to communicate with other users by video through the cameras on their mobile phones or tablets. In my training and experience, messages sent through Google's messaging applications may reveal evidence related to the criminal activity under investigation, as well as assist investigators in identifying additional participants in the criminal scheme.

53.     Google Voice allows users in the United States to make and receive calls and text messages using a single number regardless of the device from which the user is accessing the service. Users can forward calls to different phone numbers, and to multiple phones at once. Users can also receive calls and texts sent to their Google Voice number in their Google Voice inbox or in Hangouts. Google Voice users can receive voicemails in their original form or as a text transcription. In my training and experience, information stored by Google pertaining to Google Voice may provide clues related to the identity, location, or illicit activities of the user and co-conspirators.

54.     Google services such as Google Photos and Picasa Web Albums allow users to store, edit, and share images. Users may also label the photos to identify particular individuals.

In my training and experience, evidence of who was using a Google account and from where, and evidence related to criminal activity of the kind described above, may be found in these images and videos. Additionally, location information associated with a photo could provide evidence of the current and past whereabouts of the user.

55.     Google also offers a popular video-sharing service, YouTube. YouTube users can upload and share videos, and can comment on other users' videos. Google may store information about each YouTube video that a user watched, in addition to the user's own YouTube content. In my training and experience, YouTube information may contain evidence of the crime as well as the individual's state of mind. For example, a user may use YouTube to research how-to videos about safe-cracking before committing a robbery that requires successfully cracking the same make and model of safe as was depicted in the videos.

56.     Google account holders can utilize the Google Play store to download mobile applications that can be used for various purposes, including social media, banking, and travel. Through Google Play, Google may retain a list of all applications installed on a user's mobile device. In my training and experience, records of applications installed by a user can lead to evidence related to criminal activity of the kind described above, as well as to the identification of co-conspirators. Google Play records may reveal communications services used to communicate with co-conspirators, or applications used directly in furtherance of the criminal activity. Google Play records could, for example, reveal that a user installed a mobile banking application, and subsequent records obtained from the associated bank may reveal evidence that the mobile application was used to transfer illicitly obtained funds to a co-conspirator for purposes of laundering the money.

57.    Google+ is Google's social media service.  Google+ users can make posts that are accessible to the public, or may restrict access to the posts to specific people.  Users can create "collections," where they can share their posts with other users who "follow" the collection.  Google+ users can also join "communities," where members can collectively share content and view each other's posts.  Each community has at least one owner and moderator.  Google+ users may also create "circles," or groups of their friends who can see certain posts.

58.    A Google+ user's posts are added to the user's "home stream," which also may include posts shared by other Google+ users or collections that the user follows.  Users can comment on one another's posts, reshare them, or hide or "mute" them.  They can "+1" posts that they support or like.  Google+ users can share photographs, which are then stored by Google, and can post or vote on polls.

59.    Based on my training and experience, I am aware that Google+ information may contain evidence of the crime under investigation.  A user's Google+ connections or communities may reveal co-conspirators or other criminal associates.  The collections that a user follows may reveal a user's criminal activities or state of mind.  For example, a user could create a community devoted to his criminal enterprise and invite each participant in the criminal enterprise to collaborate and post content regarding their illicit scheme.

60.    In my training and experience, Google typically retains certain transactional information about the creation and use of each account on its systems.  This information can include the date on which the account was created, the length of service, records of log-in (*i.e.*, session) times and durations, the types of services utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as

22

logging into the account via the provider's website), and other log files that reflect usage of the account.

61.   In addition, Google typically retains records of the IP address used to register the account and the IP addresses associated with particular logins to the account.  IP address information can help to identify which computers or other devices were used to access the email account.  Google also collects device-specific information (such as a subscriber's hardware model, operating system version, unique device identifiers, and mobile network information including phone numbers).   Google may associate such device identifiers or phone numbers with a subscriber's Google Account.  This information can show how, when, and from where the account was accessed or used.  This information would be helpful in establishing attribution as to the owner of the google account as well as the potential owner of any cell phones or electronic devices used to connect to the captioned Google Account.

62.   Information collected by Google also may assist investigators in linking multiple accounts to a single user or identifying other accounts associated with the user.  Specifically, Google is able to identify other accounts accessed from the same computer (referred to as "cookie overlap"); accounts whose subscriber information includes same phone number or email address; and accounts where the same IP addresses were used to create or access the account in the same timeframe.  This information can be used to further identify the user and to locate additional evidence of the criminal activity under investigation.

63.   Further, Google maintains location history for its users.  Google collects and processes an account holder's geographic location information when signed into Google services and maps those locations.  Google can use a variety of information to determine location, including IP address and GPS.  Google also may gather information regarding nearby devices, Wi-Fi access

23

points, and cell towers. Location information may also be gleaned from Google services such as Google Maps. The owner of the captioned Google Account allegedly travels outside of his area of residency on a regular basis to conduct criminal activity. Location history for the captioned Google Account would assist investigators in determining whether the captioned user was likely involved in the aforementioned criminal activity.

64.     The user's account activity, logs, stored electronic communications, and other data retained by Google can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, email communications, contacts lists, and images sent (and the data associated with the foregoing, such as geolocation, date and time) may indicate who used or controlled the account at a relevant time.

65.     The logs, user attribution, and location information held by Google also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation. This geographic and timeline information may tend to either inculpate or exculpate the account owner. Additional information stored at the user's account may further indicate the geographic location of the account user at a particular time (*e.g.*, location information integrated into an image or video).

66.     Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offense under investigation. For example, information in the account may indicate the owner's motive and intent to commit a crime (*e.g.*, communications relating to the crime or map searches regarding the location where the crime was committed), or consciousness of guilt (*e.g.*, deleting communications or account information in an effort to conceal evidence from law enforcement).

24

67.     As explained herein, information stored in connection with a Google account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

68.     There is reason to believe Google is still in possession of records related to the accounts.  On December 19, 2018, a preservation request was submitted electronically to Google requesting that, for a period of 90 days, Google "take all necessary steps to preserve records and other evidence in its possession pending the issuance of a court order or other process," pursuant to 18 U.S.C. § 2703(f). Google maintains and stores content and non-content data associated with an account for an extended period of time, potentially indefinitely if the account holder does not affirmatively delete the data.  For example, an email that is sent to a Google subscriber is stored in the subscriber's inbox on Google's servers until the subscriber deletes the email.  If the subscriber does not delete the message, the message can remain on Google's servers indefinitely. Even if the subscriber deletes the email, it may continue to be available on Google's servers for a certain period of time.

69.     Based on my training and experience, I believe that data stored by Google in connection with the above services may contain evidence of the substantive crimes under investigation, as well as evidence of the account holders' geographic location and travel plans, the true identity and/or aliases of the account holders, and the location of financial assets subject to seizure.

70.     This application seeks a warrant to search all responsive records and information under the control of Google, a provider subject to the jurisdiction of this court, regardless of where Google has chosen to store such information. The government intends to require the disclosure

25

pursuant to the requested warrant of the contents of wire or electronic communications and any

records or other information pertaining to the customers or subscribers if such communication,

record, or other information is within Google's possession, custody, or control, regardless of

whether such communication, record, or other information is stored, held, or maintained outside

the United States.[1]

---

[1] It is possible that Google stores some portion of the information sought outside of the United States. In Microsoft Corp. v. United States, 2016 WL 3770056 (2nd Cir. 2016), the Second Circuit held that the government cannot enforce a warrant under the Stored Communications Act to require a provider to disclose records in its custody and control that are stored outside the United States. As the Second Circuit decision is not binding on this court, I respectfully request that this warrant apply to all responsive information — including data stored outside the United States— pertaining to the identified account that is in the possession, custody, or control of Google. The government also seeks the disclosure of the physical location or locations where the information is stored.

## **CONCLUSION**

71.      Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on Google, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

Chase A. Stephens, Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me
on _____, 2019

CYNTHIA R. EDDY
CHIEF UNITED STATES MAGISTRATE JUDGE